*J. A. Brannen* and *Moore & Deal*, for plaintiff in error.
*H. B. Strange*, contra.

---

PERKINS LUMBER COMPANY *v.* THOMAS.

When, with full knowledge that the owner of a sawmill has acquired a right to construct a tramroad over certain lands, a company engaged in the lumber business purchases a right of way and lays a railroad track across these and adjoining lands, the former can not be held to have relinquished his vested rights in the premises, or be estopped from asserting the same, merely because he may have stood by and interposed no objection to the building of the company's road, unless his implied assent to the construction thereof

was, necessarily, wholly inconsistent with his thereafter undertaking to build a tramroad which crossed, at grade, the company's track.

Argued February 13,— Decided March 17, 1903.

Petition for injunction.   Before Judge Evans.   Bulloch superior court.   December 16, 1902.

*T. W. Hardwick,* for plaintiff.

*Tyler & Anderson,* for defendant.

SIMMONS, C. J.   In December, 1893, R. N. Williams conveyed to J. J. Williams 327 acres of land, adjoining lands owned by one Holloway and others, and lying in the 45th district of Bulloch county. The deed evidencing this transfer of title was properly executed, but was not recorded.   In January, 1899, J. J. Williams sold to W. C. Thomas all the timber suitable for sawmill purposes standing on 199 acres of the tract just mentioned, and conveyed to him a right of way over that portion of the land upon which this timber was situated.   The deed made in pursuance of this sale and grant of a right of way over 199 acres of the tract of land owned by J. J. Williams was filed for record on December 1, 1902.   In the early part of 1901, he "resold the land to R. N. Williams," but " neglected to make him a conveyance thereto, although he paid all the money at the time he purchased."   On April 17, 1902, R. N. Williams executed and delivered to the Perkins Lumber Company a deed, whereby he undertook to convey to that company a right of way over the land he had repurchased from J. J. Williams.   This deed was recorded on December 2, 1902. Since the date of the conveyance from J. J. Williams to Thomas, the latter has exercised rights of ownership over the land therein described, by " off and on " cutting the timber sold to him. " R. N. Williams and J. H. Perkins, as agent of the Perkins Lumber Co., both had full knowledge and notice of Thomas's rights at the date of the deed from R. N. Williams to " that company.   It desired to construct a tramroad from Hagan to Register.   While a route was being surveyed between those points, and at a time when John H. Perkins, one of the directors of the company, was " acting for it in acquiring the right of way, assisted by J. J. Williams," Thomas "had a conversation with them, in which they discussed some difficulty " the company was encountering " in getting a right of way through the Holloway land," which was ad-

jacent to and " which was originally a part of the Williams land."
Thomas " told them, Perkins and Williams, that [he] had a right of
way through all this Williams land, and that if they had any
trouble in getting a right of way through the Holloway tract, they
could go through on [his] right of way. Thus they had, at the
time, full notice and knowledge of [his] right as to the tract of land "
described in his deed from Williams. Nothing further appears to
have been said on the subject ; but the Perkins Lumber Company
subsequently selected a route over the Williams land, built its
track, and began operations. This route lay between Thomas's saw-
mill, at Register, and a portion of the timber sold him by J. J. Will-
iams. Some time after the conversation above referred to and
the completion of the company's tramroad, Thomas, acting under
the impression that it " knew he intended to cross [its] road," and
believing " it was tacitly understood between them that [it] would
not object to his doing so," made arrangements to carry out his
project of building a tramroad between his sawmill, at Register, and
the tract of timber on the Williams land just mentioned. To this
end, " he bought iron, ties, etc., and so much of the right of way
on his proposed route as he did not already own, and laid out and
constructed about 1 1/2 miles of his road, and has expended large
sums of money in doing so." Believing " no one would object to
or oppose his right to cross " the road of the Perkins Lumber Com-
pany, he laid across its road a temporary crossing, " and actually
crossed it and built about 3/4 of a mile of track on the opposite
side." At this stage the company filed a petition for injunction,
alleging the following : " Thomas applied to [it] for permission to
cross its tracks, and this permission was refused, and the right to
cross has never been acquired in any way by the said Thomas."
Over its objection " he proposes to cross [its] right of way at a point
about one quarter of a mile south of Register, at the bottom of a
hill. At this point the grade is such that, coming from Hagan with
a load, the cars of petitioner would go down a decided hill to this
crossing, and when loaded would be unable to stop ; and because of
this, life and property would be in danger. In going from Register
to Hagan, if the cars of . . petitioner, when loaded, were to stop at
this crossing, they could not be pulled up the hill, the momentum
incident to [their] motion being necessary for this ascent." Aside
from " the fact that the said Thomas has no right or authority to

cross, his selection of a place is peculiarly unfortunate." At the time Thomas applied for, but was refused, "permission to cross, as he is now doing, petitioner suggested a plan whereby it would consent to his use of a 'Y,' by means of which he could go on the main line of petitioner and within twelve months cut the timber now owned by him. . . The said Thomas declined this, upon the ground that it would cause him considerable expense on account of his having already built a half mile of track, which was done by said Thomas without asking permission from petitioner to cross." Despite its objections, he "has placed a temporary crossing over the tracks of . . petitioner, and at the point mentioned, and insists that he can use the same as he pleases, without permission" from it. "He threatens, unless restrained, to forcibly use this crossing in utter disregard of the rights of" petitioner.

To this petition Thomas filed an answer, in which he denied that he had applied for and been refused permission to cross the road of the company. On the contrary, he alleged, it consented to his crossing its line at the point in question; "that while he was constructing [his] said road, he discussed putting in his cross-frog with" the company's "general manager, Mr. Carl Perkins," who told him that he (Perkins) "would send his hands down and put in the frog, and only charge him the actual cost of same." Thomas also set forth in his answer the following allegations of fact: The company, before acquiring its right of way, had actual notice of his rights in the Williams tract of land. He did have "a conversation with plaintiff's officers, in which they suggested that he use part of their 'Y,' as alleged; and he suggested that this would cause him considerable trouble and expense, as he had already built about 3/4 mile of his road, and plaintiff told him they would let him know definitely later what they would prefer him to do in the matter, but, instead of doing so, applied immediately for a restraining order." The point "where he has crossed plaintiff's road is the most convenient place for plaintiff and himself for him to cross it; and if he should use the portion of their 'Y' and the route they suggested, he would have to buy right of way for a considerable distance, a great portion of which would go through the town of Register, and several farms and cultivated fields, and would incur heavy expenditures for same, and great loss in abandoning that which he already has, and in moving his road." He had actually

crossed the track of the plaintiff, at that point, without objection on the part of its officials, and had " built about 3/4 of a mile of track on the opposite side, . . before they applied for injunction; and his confidence in their willingness for him to cross their road was inspired by their non-action and acquiescence in what he was doing, and by reason of this and his legal rights in the matter he has expended considerable money and labor." Before taking steps to construct his tramroad, " he applied to plaintiff to lease a portion of their ' Y' and track and build his road on the route they suggested, and they refused to accede to his proposition; and, after repeated efforts to make this arrangement, he constructed his present road."

Both the petition and the answer were sworn to. At the hearing of the case, at chambers, evidence was introduced which, in addition to the facts hereinbefore recited, disclosed the following state of affairs: " The average railroad-train of plaintiff is composed of about seven loaded cars, besides engine; the maximum train of about eleven loaded cars, besides engine; and it would be impossible for even an average train — in fact, for one [having] over five loaded cars — to be stopped at " the proposed crossing, in view of the steep grade, near this point, on the company's line of road. By " taking up the railroad track of plaintiff, suspending its railroad business while the change was being made, and grading the steep hill several hundred yards away (not on the Williams right of way), the grade of plaintiff's railroad could be made sufficiently level for defendant to cross the same, but the physical work of such grading would cost about two thousand dollars." There is " no point on the Williams right of way claimed by defendant at which [he] could safely cross the railroad of plaintiff, unless the grading of the big hill was done." The distance from the top of this hill to its foot is some 1620 feet, " and the fall in that distance [is] 52 ft. and 10 in." From the foot of the hill to a point some 240 feet in the direction of Register, there is a " practically level track, and the proposed crossing of defendant [is] located within a few feet of the end of the level track." Thence there is a slightly ascending grade for a distance of 780 feet, " the fall on that grade [being] one foot to the hundred." Any crossing by Thomas of plaintiff's road, " in order to be safe, must be at least fifteen hundred feet north of his proposed crossing." This point would not

be " on the Williams right of way at all;" and there can " be no safe crossing at any point on the right of way claimed by defendant, unless the hill were graded, as already " stated.

His honor of the court below refused to grant the injunction prayed for by the Perkins Lumber Company, and it sued out a writ of error to this court.   On the argument here, counsel for the company invoked the doctrine of equitable estoppel in support of its contention that Thomas should be enjoined from crossing its road at any point on the Williams tract of land.   In the first place, much stress is laid on the conversation between him and the company's representatives, at a time when the latter were experiencing some trouble in acquiring a right of way for its road.   One of them, J. J. Williams, certainly knew all about Thomas's vested rights at that time; for J. J. Williams was Thomas's grantor.   Moreover, in the course of that conversation Thomas gave to John H. Perkins, a director of the company, express notice of the fact that he (Thomas) had already acquired "a right of way through all this Williams land."   True, Thomas, at the same time, offered to allow the company to "go through on [his] right of way," if its representatives should encounter "any trouble in getting a right of way through the Holloway tract," as then contemplated.   But this offer was never accepted.   On the contrary, the company's representatives went to R. N. Williams, who was then the equitable owner of the land, and got him to make a deed to the company covering the route through the land they had selected.   Thomas was altogether ignored, notwithstanding it was his privilege to elect over what particular route through the Williams land he would construct his road.   By not exercising this privilege, but standing by and allowing the company to build its line, he doubtless estopped himself from asserting a right to select and occupy the route it chose.   But the company certainly was not justified in assuming that he was willing, without any consideration whatsoever and without even being consulted, to altogether relinquish his rights in the premises and abandon his project of building a road from his sawmill to the tract of timber he had purchased, which could not be reached without crossing, at some point, the right of way chosen by the company.   Nevertheless, it so graded (?) its road as to render the operation of its cars perilous to him, in the event he crossed its line at any point on the Williams tract.   Within the limits of that tract

the grading of the company's road was properly done, and Thomas could not, had he wished, have offered any objection thereto. Beyond lay a steep hill which might have been, but was not, so graded as to altogether obviate any unusual danger attending a crossing of the company's road at the point where Thomas now seeks to cross. This being so, he was under no obligation to undertake to dictate to the company what kind of a grade it should, for the time being, establish in constructing its track over this hill. In building its line it was bound to respect his rights, of which it had full knowledge; and its officials were not warranted in assuming that, merely because he did not pursue them with objections as to the manner in which they were constructing its road over lands in which he had no interest, he was silently acquiescing in everything they did, whether necessary and proper, or quite the reverse. To assent to their building a line over this hill would not, by necessary implication, involve a relinquishment on his part of his vested rights in the Williams tract. That hill was not even remotely related to the "Notch of the White Mountains." See, in this connection, *Davis* v. *Railway Co.*, 87 *Ga.* 609.

In other words, to properly construct a tramroad over the hill at the place selected by the company was by no means inconsistent with a use by Thomas of a road built across the Williams tract, intersecting, at the point chosen by him, the road of the company. The steep grade which it chose to establish, in order to save itself expense, will have the effect of rendering its road less useful and profitable in the future, if Thomas is permitted to complete his road as contemplated. That is to say, the company will no longer be able, as in the past, to operate over this grade an "average" train, composed of an engine and "about seven loaded cars," but only trains having, besides a locomotive, not "over five loaded cars." This state of affairs should have been, if it was not in fact, anticipated at the time the company built its road. If it was, then the company must have assumed that, to the end that it might be saved something like $2,000, Thomas was willing, without any consideration, to give up his project of subsequently constructing a road of his own from his sawmill to the tract of timber he had previously purchased. If the company had no thought save to build its line as cheaply as possible, it simply overlooked the fact that cheap construction is not always calculated to give the best results in the

way of producing a railroad which is useful and profitable. As all that is charged up to Thomas is that he " stood by " and allowed the company to build its road as it pleased, we are not prepared to hold it was warranted in assuming that he was a philanthropist, merely because he did not attempt to intermeddle with its affairs and point out to its officers that it would prove poor economy to establish such a grade as that adopted ; nor are we prepared to hold he should pay the penalty of any thoughtlessness or lack of judgment on their part. Under such circumstances, the best way in which to procure an estoppel is to buy and pay for it, if one be for sale. It is barely possible that Thomas, if consulted, would have positively declined to part with the vested rights which we are asked to adjudge he tacitly, without knowing what he was doing, sold for naught.

Our attention has been directed to several prior adjudications by this court in cases where the doctrine of equitable estoppel was successfully invoked. See *City of Atlanta* v. *Gas Light Co.*, 71 *Ga.* 107; *Mayor &c. of Athens* v. *Georgia Railroad*, 72 *Ga.* 800; *Georgia Pacific Ry. Co.* v. *Strickland*, 80 *Ga.* 776 ; *Southern Marble Co.* v. *Darnell*, 94 *Ga.* 232. A casual examination of these cases will suffice to show that not one of them presented a state of facts having any marked similarity to the condition of affairs disclosed by the record now before us. It may be that the doctrine of estoppel lurks behind some of the facts of this case ; but if so, it attaches itself to the conduct of the Perkins Lumber Company with respect to allowing Thomas to go to expense and trouble, and not to his conduct in permitting that company to construct its road over the route it selected.

*Judgment affirmed. By four Justices. Lamar, J., disqualified.*